[Civ. No. 7837.   Second Appellate District, Division One.—May 18, 1934.]

JESSIE ESTELLE JAMES, Appellant, v. PARAMOUNT–FAMOUS–LASKY CORPORATION (a Corporation) et al., Respondents.

L. H. Phillips, W. C. Dalzell and Chas. R. Thompson, for Appellant.

Faries & Williamson, McIntyre Faries, Frank James, Henry Herzbrun and Everett H. Mills for Respondents.

HAHN, J., *pro tem.*—Appeal by plaintiff from a judgment of nonsuit rendered in an action brought to secure a money judgment.

The controversy arises out of the filming of a picture intended to portray the activities of the notorious Jesse James, who was the grandfather of the plaintiff. The amended complaint contains three counts. The first alleges that plaintiff performed services for defendants at their request, and that the reasonable value of the services so performed was $20,000. The second count is based upon an alleged contract which plaintiff avers she had with defendants, whereby she was employed to perform certain services ''as an actress, and as an assistant and means of obtaining publicity in the production and distribution of a certain moving picture dealing with the life of Jesse James, from and after the 23rd day of June, 1927, to the time of com-

pletion of said picture in approximately eight months".
Plaintiff further alleges that at the time of making the contract, defendants agreed to pay plaintiff the reasonable value of her services, payments to be made monthly and upon completion of the picture. "That plaintiff entered upon the performance of her duties under said contract on the 23d day of June, 1927, and from that date until on or about the 1st day of October, 1927, plaintiff presented herself daily at the picture lot of the Paramount-Famous-Lasky Corporation, and did whatever service she was requested . . . "

The complaint then alleges that on October 1, 1927, she was informed by defendants they had no further use for her services, "that they had engaged another actress to take the part which plaintiff had been engaged to take" and refused "to employ her any further in any capacity whatsoever". As damages for this alleged breach of contract, she asks for the sum of $35,000.

In the third count, which sounds in fraud, plaintiff alleges she was induced to enter into the alleged contract declared in count two, and induced to leave her position in Kansas City, where she was employed at $110 per month, and to come to California to take part in the filming of the picture referred to by defendants, without any intention on their part "of performing or fulfilling their agreements with, and their promises made to the plaintiff". That defendants, in all their dealings and representations and promises "were, and each of them was, guilty of oppression, fraud and malice". As damages in this third count, plaintiff asks for $1,000 compensatory damages and $50,000 as exemplary damages.

At the outset of the trial, the court granted a motion made by the defendant Paramount-Famous-Lasky Corporation to require plaintiff to elect as between counts two and three, upon which cause of action she would proceed to trial. Pursuant to the court's order, plaintiff elected to proceed on counts one and two.

Appellant has assigned seventy-two alleged errors committed by the court as grounds for a reversal of the judgment. In view of our conclusion, we deem it necessary to consider but a few of the points raised.

Taking up first the court's ruling on the defendant Paramount-Famous-Lasky Corporation's motion for a nonsuit, we fail to find in the record any evidence whatever that would support a finding that plaintiff had any contract with said defendant, or that she rendered any services for it. The only connection which the record discloses that the defendant corporation had with the picture was that it had a contract to act as distributor of the picture when completed. No connection is shown between any of the persons with whom plaintiff corresponded or with whom she had any conversations, and the defendant Paramount-Famous-Lasky Corporation.

In view of our conclusion that neither the alleged contract nor the alleged services rendered by plaintiff were brought home to defendant corporation, the court's ruling on this defendant's motion to require plaintiff to elect between her causes of action, set forth in counts two and three, becomes of no importance.

The cause of action set forth in count three was predicated upon the same alleged contract upon which count two was based. Plaintiff was given unlimited opportunity to prove the contract with the Paramount corporation, as alleged in count two. This she failed to do. Hence, had said defendant's motion to require plaintiff to elect been denied, the judgment of nonsuit would have been as well foundationed with count three still in the case, as it is with the court's ruling requiring her to elect. Nor does it appear by inference, or otherwise, that any of the questions to which objections of defendant were sustained, would have furnished the necessary evidence to show that plaintiff either rendered services to defendant Paramount-Famous-Lasky Corporation, or that she had any contract with said defendant whereby she was employed to render any of the services as alleged in her complaint.

As to the defendant David R. Faries, executor of the last will and testament of Fred C. Thomson (for the sake of brevity, we will refer to this defendant as Faries), there are other considerations which merit attention.

Inasmuch as Faries did not join in the motion to require the plaintiff to elect as between her second and third causes of action, the court's ruling on this motion does not affect his case.

■ In support of the court's ruling on his motion for a nonsuit, Faries urges that there is no substantial evidence in the record to support plaintiff's claim that she ever rendered any services to or for Fred C. Thomson, or that there ever was an agreement between plaintiff and Fred C. Thomson, whereby he employed her to render any services for him as an actress or otherwise.

After a careful examination of the record, we have come to the conclusion that respondent Faries' contention on this point must be sustained.

Plaintiff's case, so far as the alleged contract is concerned, is predicated upon the theory that while she was employed in Kansas City, defendants entered into a contract with her whereby she was to come to California and take the part, as an actress, of one Zerelda Samuels in the filming of a picture that was to be made depicting the life of Jesse James, her grandfather, and also to assist in creating publicity for the picture. The record is devoid of any evidence that would support such a theory or contention. In a letter written at Kansas City, dated June 6, 1927, and directed to one Lloyd Ingraham as "Director, Fred Thomson Productions" at Hollywood, plaintiff says: "I am planning to leave Kansas City for Los Angeles, on June 15th, to join my family, Mr. and Mrs. Jesse James, Jr., and am very anxious to obtain a small part in the picture of my Grandfather's life."

A reply to this letter was written by one Alfred L. Werker, who gave himself the title of "Prod. Supervisor" on a letter-head bearing the inscription "Fred Thomson Productions", which reads as follows: "Your father . . . has already spoken to me about a screen test for you when you arrive in Hollywood. We will be very happy to make a test of you and may possibly find something for you to do in the filming of the picture."

Other than testimony as to the contents of a telegram sent to plaintiff by her father which purported to relate the substance of a conversation he had with Alfred L. Werker, writer of the letter just referred to, which was clearly hearsay, the letters quoted from constitute all the evidence in the record as to plaintiff's negotiations with anyone connected with the picture while she was in Kansas City. That

this evidence not only fails to support the theory of such a contract, but clearly shows that no such contract was at that time in existence, but that she came to Los Angeles in the hope that she might secure a part in the picture, seems too clear to require discussion.

Plaintiff arrived in Los Angeles on June 22d. A day or two later she first visited the F. B. O. studios, where the picture was being filmed. On this occasion, she met at the studio Lloyd Ingraham, the director to whom she had directed her letter written in Kansas City; Alfred L. Werker, who had written a reply to her letter, and who had the title of "Production Mgr."; also one Douglas S. Dawson, who was known as "business and production manager"; James M. Jerauld, a publicity man for Paramount-Famous-Lasky Corporation, and Neal Harbarger, a cameraman, who testified he was then working for "the Thomson Company". On this and one or two subsequent visits to the studio, plaintiff posed, either alone or with other members of her family for still pictures which were taken by the cameraman Neal Harbarger. On the occasion of her first meeting with Werker, Dawson, Jerauld and Ingraham, one or all of these gentlemen told her that she had been selected to play the part of Zerelda Samuels, her father's grandmother, in the Jesse James picture. On her second visit to the studio, she first met Fred Thomson, who as the star in the picture was taking the part of Jesse James. Concerning this meeting, plaintiff testified as follows: "Q. Were you introduced to Mr. Thomson? A. Yes sir. Q. Any conversation take place between you and Mr. Thomson? A. Yes sir. Q. And when I say 'Mr. Thomson', I refer to Fred C. Thomson. A. Yes sir. Q. The defendant in this action. What was said by Mr. Thomson? A. Mr. Thomson told me that I was to play the part of Zerelda Samuels in the picture, 'Jesse James'. Q. Did you make any reply? A. Yes sir, I did. I laughingly said, 'Well, I feel rather young to have a son as old as you are.' Q. And what was his reply? A. Mr. Thomson replied, 'Well, maybe I am not so very old.' He said, 'Evidently, you are not acquainted with the arts of movie make-up, that we can make you appear just as old as we want to'; and Mr. Thomson, at that time made reference to a picture; as I recall it now, I

think it was Colleen Moore's picture, 'So Big'; and he asked me if I had seen it. He said, 'You remember that Colleen Moore played the part of an old lady in this picture, and she is not much older than you.' "

Mrs. Jo Frances James Ross, a sister of plaintiff, testified concerning this conversation with Fred Thomson, as follows: "Mr. Thomson told her that they had decided to let her play the part, or to give her the part, of Zerelda Samuels, and she jokingly said that she felt quite young to have a son as old as he; and he told her that the make-up—by the use of make-up they could make her look as old as they wanted to."

Plaintiff never was given the part of Zerelda Samuels. Instead, this part was played by one Mary Carr. After plaintiff learned she was not to have the part, she took a minor part in a courtroom scene. As compensation for her services in the part she took, she was paid $22.50 by the F. B. O. Studios, Inc. The three receipts she signed for these payments, other than the dates and the amounts shown in the receipts, are identical, and read as follows:

"F. B. O. Studios, Inc. No. 480.
"Los Angeles.
"TALENT PAY CHECK, Date: Jul. 30, 1927.

"Pay to Jesse James . . . $10.00. Exactly Ten Dollars only Dollars, In full payment for services in pictures No. 370.

"Approved for payment: Martha Lennan.

"I hereby acknowledge receipt of the above sum from the F. B. O. Studios, Inc., as payment in full to date for services in posing, and hereby consent to the public exhibition, for the purpose of trade or advertising, of any picture ever posed by me for the F. B. O. Studios, Inc.

"Signature: Jesse James. (Stamped): Cashier, Jul. 30, 1927. Reimbursed."

It does not appear that at any time during the filming of the picture which was completed about September 30th the plaintiff made any complaint because she was not given the part of Zerelda Samuels, although she knew quite early in July that Mary Carr was to play that part. Having this information, she seemed content to accept the minor part assigned to her, and accepted without comment the

compensation paid her for the work she actually did do. Nowhere does it appear that she ever made any claim for monthly compensation, as she alleged the contract provided she was to have.

There are other considerations which might be dwelt upon at length that give support to respondents' contention that appellant has failed to bring home to Fred Thomson any contract of employment, such as is alleged by plaintiff in counts two and three of her complaint. We feel that the reasons pointed out are sufficient to support our conclusion on this point.

As to count one, which is an action to recover the reasonable value of services which plaintiff alleges she rendered for and at the request of defendants, respondent Faries offers two answers, both of which have merit.

The receipts in evidence show that plaintiff accepted from the F. B. O. Studios, Inc., a corporation, three payments for the services she actually did render in the filming of the pictures, for which she signed receipts as payment in full for services rendered up to the date of payment. Again, there is no evidence in the record that the services she performed in the filming of the picture were rendered for, or at the request of Fred Thomson, or any duly authorized agent of his. There is evidence that justifies the inference that the Fred Thomson Pictures, the Fred Thomson Productions, and the Fred Thomson Company, each and all had some connection with the making of the picture. If these concerns were in fact operating names under which Fred Thomson was producing the pictures, the burden was upon plaintiff to so show. It would have been a simple matter to adduce evidence as to who constituted the concerns named. The fact that no evidence was offered by plaintiff on this point justifies the inference that the evidence, if presented, would have been adverse to plaintiff's contention.

In view of our conclusions with regard to the alleged contract, which forms the basis of the cause of action in count two, the evidence is fatally lacking in the necessary proof to support a judgment in favor of plaintiff and against defendant Thomson in the cause of action set forth in count three.

We find nothing in any of the court's rulings which forms the basis of the remaining alleged errors that in any way affects our conclusions on the points discussed.

The judgment is affirmed.

Conrey, P. J., and Houser, J., concurred.